UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION – LEXINGTON

| | |
|---|---|
| SKYWAY TOWERS, LLC, CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, and MICHAEL QUAGLIANO,    Plaintiffs, | CIVIL ACTION NO. 5:15-301-KKC |
| V. | OPINION AND ORDER |
| LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT, and the LEXINGTON-FAYETTE URBAN COUNTY PLANNING COMMISSION,    Defendants. | |

This matter is before the Court on the motions for summary judgment (DE 19, 21) filed by the plaintiffs and defendants. In addition, the Historic Mt. Horeb Pike Neighborhood Association has filed a motion to intervene in the action (DE 25).

### I. Background

The plaintiffs in this matter seek to construct a 190-foot monopole wireless communications facility on property in north Fayette County, Kentucky that is currently used as a farm and pasture land for horses. The plaintiff Skyway Towers, LLC constructs and manages wireless telecommunications facilities and then leases space on the facilities to national and regional wireless carriers to provide personal wireless services to consumers. The plaintiff Verizon Wireless provides wireless communications services. The plaintiff Michael Quagliano owns the property where Verizon and Skyway seek to install the facility.

Verizon sought to construct the facility after its engineers identified a "significant gap" in its wireless service coverage in the area. Verizon and Skyway applied with the

Lexington-Fayette Urban County Government (LFUCG) Planning Commission for the necessary approvals. With their application, the applicants submitted a report detailing their site-selection process. (DE 16-1, Application at CM-ECF p. 8; DE 16-3, Site Selection Report at CM-ECF p. 6.) The report states that the process was aimed at identifying "the least intrusive of all the available and technically feasible parcels in a service need area." It further explained that the proposed site met all local zoning requirements for the placement of a telecommunications facility. (DE 16-3, Site Selection Report at CM-ECF p. 9.)

The application included a map depicting the "search area," which is the location where the monopole must be located to close the coverage gap pursuant to radio-frequency requirements. (DE 16-3, Radio Frequency Search Area at CM-ECF pp. 3, 11.) The applicants also submitted a report and maps prepared by a radio frequency engineer depicting the coverage gap. (DE 16-3, Radio Frequency Engineer Report at CM-ECF p. 13.) The application explained that the "tower must be located at the proposed location and proposed height to provide necessary service to wireless communications users in the subject area." (DE 16-1, Application at CM-ECF p. 9.)

The LFUCG's Division of Planning staff reviewed the application to determine if it complied with Article 25 of the local zoning code, which regulates the placement of telecommunications towers. Zoning Ordinances, Art. 25, http://lexingtonky.gov/. The staff also reviewed the application to determine if it complied with the county's 2013 Comprehensive Plan, which sets forth certain goals and objectives for land use in the county including protecting historic resources and archeological sites, supporting the agricultural economy and horse farms, and protecting and enhancing the county's natural, cultural, historic, and environmental resources. 2013 Comprehensive Plan, http://www.lexingtonky.gov/2013CompPlan/.

The staff concluded that the application met all of the requirements of Article 25 but nevertheless determined that this was "not an ideal situation." (DE 16-11, Staff Report at CM-ECF p. 6.) The staff noted that it had received a letter from the Office of State Archaeology stating that, within approximately a mile of the proposed site, there are three archaeological sites, two of which are listed on the National Register of Historic Places and a third of which is considered eligible for listing. According to the staff, the letter "notes the negative visual impact the tower will have on the view shed from each site." (DE 16-11, Staff Report at CM-ECF p. 2.)

The staff agreed that the tower would affect the view shed in the area but concluded that "it may be no more of a negative with regard to visual impact" than Clear Channel radio towers already in the area, "which are four towers clustered together, the tallest of which is approximately 400 feet in height." The staff opined that "[e]ventually the proposed tower will become part of the landscape of the area, much like these radio towers have." (DE 16-11, Staff Report at CM-ECF p. 3.)

The staff noted that, in compliance with federal law, the applicants had obtained letters from the Kentucky Heritage Council regarding the impact of the proposed facility on historic and archaeological sites included in the National Register. (DE 16-11, Staff Report at CM-ECF p. 2.) The first, dated March 30, 2015, states that the council's survey "found no evidence of prehistoric or historic archaeological sites. Therefore, the authors concluded that the project will have no adverse effect on archaeological resources that are potentially eligible for listing on the National Register of Historic Places. I concur with the author's findings." (DE 16-5, CM-ECF p. 51.)

The second letter, dated May 4, 2015 states "[a]s there are not Eligible or extant Listed historic resources located within either the direct or indirect [area of potential effect]

3

for this project, we concur with your assessment of No Historic Properties Affected for the proposed Skyway Towers, LLC Mattoxtown tower site." (DE 16-5 at CM-ECF p. 52.)

The staff further noted the applicants had obtained a letter from the LFUCG Division of Historic Preservation. (DE 16-11 at CM-ECF p. 2.) That letter also stated that the division had found "no properties currently listed in the National Register of Historic Places nor eligible for listing are located within the [area of potential effect]." (DE 16-5 at CM-ECF p. 53.) The staff further noted that, in compliance with federal law, the applicants had obtained a National Environmental Policy Act (NEPA) review. (DE 16-11 at CM-ECF p. 2) The NEPA report found "no recognized environmental conditions were identified for the site." (DE 16-5 at CM-ECF p. 58.)

The staff opined, however, that "a tall monopole does not fit either the historic or rural context of the area." (DE 16-11, Staff Report at CM-ECF p. 6.) The staff recommended that the applicants use an alternative tower design that is "context-sensitive to the rural area," such as a silo or faux water tower. (DE 16-11, Staff Report at CM-ECF p. 7.)

The commission considered the application at a public meeting on September 10, 2015. At that meeting, Verizon submitted an additional statement by its radio frequency engineers detailing the need for the facility. (DE 16-4 at CM-ECF pp. 2, 17) The statement included coverage plots which, according to the engineers, demonstrated that "[a] significant wireless network service gap exists in Lexington which negatively affects substantial numbers of wireless users throughout the area." (DE 16-4, Report at CM-ECF p.21.) The statement also included a map which indicated "where a new facility must be located to close this growing service capacity gap."  (DE 16-4 Report at CM-ECF p.21.)

In addition, Verizon submitted a network analysis containing "dropped call data." (DE 16-4, Analysis at CM-ECF pp. 34-45.) The report details the existence of a coverage gap in the location of the proposed monopole and states that the proposed facility will mitigate

4

the gap and diminish the drop-call rate. (DE 16-4, Report at CM-ECF p. 54.)

At the meeting, a planning staff member presented the staff report. Counsel for the applicants explained the evidence submitted in support of the application and offered the engineering and scientific experts for questioning. (DE 18-2, Tr. at CM-ECF pp. 2 -15 ) No commissioner asked the experts any questions.

Several area residents spoke in opposition to the application. (DE 18-2, Tr. at CM-ECF pp. 19-30.) Some asserted that there were historic and archaeological sites in the area and others expressed concern about the visual impact of the tower. Counsel for one resident introduced letters from two real estate brokers stating that the monopole would negatively impact the value of the surrounding properties. (DE 16-17, Letters.) He also stated that 40 area residents had signed a petition and 14 had written letters opposing the application. (DE 18-2, Tr. at 18-28.) In addition, Jennifer Ryall of the Kentucky Heritage Council stated that the council had reopened its review of the proposed tower in light of concerns expressed by area residents and the Office of State Archaeology.

A commissioner moved to disapprove of the application because "there is not adequate exploration of alternate locations in the potential search ring" and "there's not adequate consideration of negative significant interest in the cultural and historic resources, based on the testimony of the representative of the Kentucky Heritage Council." (DE 18-2, Tr. at 33.) The motion passed.

By letter dated September 30, 2015, the LFUCG notified the plaintiffs that the planning commission had disapproved the application, again stating:

> 1) There is not adequate exploration of alternative locations in the potential search ring to provide the necessary coverage.
> 2) There is not adequate consideration of negative significant interest in the cultural and historic resources, based on the testimony given by the representative of the Kentucky Heritage Council.

(DE 16-14, Sept. 30, 2015 Letter.)

5

The plaintiffs seek a review of this decision pursuant to 47 U.S.C. § 332(c)(7)(B)(v) which provides that any person adversely affected by a state or local government's actions regarding the placement and construction of a communications facility may seek judicial review.

### II. Motion to Intervene

The Mt. Horeb Pike Neighborhood Association, which is made up of property owners in the area of the proposed facility, moves to intervene in the action. Federal Rule of Civil Procedure 24 provides that the Court must allow anyone to intervene who:

> (1) is given an unconditional right to intervene by a federal statute; or
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).

Mt. Horeb does not argue that a federal statute grants it the right to intervene. Instead, it seeks to intervene under the Rule 24(a)(2). The Sixth Circuit has interpreted that rule as requiring the movant to establish each of the following four elements:

> (1) the application was timely filed;
> (2) the applicant possesses a substantial legal interest in the case;
> (3) the applicant's ability to protect its interest will be impaired without intervention; and
> (4) the existing parties will not adequately represent the applicant's interest.

See *Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011)(citing *Grutter v. Bollinger*, 188 F.3d 394, 397–98 (6th Cir. 1999)). "[F]ailure to satisfy any one of the elements will defeat intervention under the Rule." *Id.* (citing *United States v. Michigan*, 424 F.3d 438, 443 (6th Cir. 2005) and *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989)).

6

Mt. Horeb asserts that it has a substantial legal interest in protecting the natural, scenic, historical, cultural, agricultural, and property value of the land where the proposed monopole will be located. It argues that this interest will be negatively impacted if the court permits the monopole to be constructed and, thus, its ability to protect this interest may be impaired if it is not permitted to intervene. Mt. Horeb further argues that the LFUCG does not have the same interests as the neighborhood association and, thus, its interest will not be adequately represented absent intervention.

The LFUCG, however, has argued that its actions in this case have been guided by Article 25, a local zoning ordinance that was specifically intended to protect the interests that Mt. Horeb asserts. Zoning Ordinances, Art. 25, http://lexingtonky.gov/. That ordinance is intended to assure that communications facilities are placed in locations that "provide adequate cellular telecommunications services *while protecting the public, preserving the character and value of surrounding property, and protecting the view* from residential areas." Zoning Ordinances, Art. 25, § 25-1, http://lexingtonky.gov (emphasis added).

Moreover, Mt. Horeb and the government share the same ultimate objective in this action: that the Court affirm the government's denial of the application. While the proposed intervenor need only show that there is a potential it will be inadequately represented, there is a presumption of adequate representation when an applicant shares the same ultimate objective as a party to the suit. *United States v. Michigan*, 424 F.3d 438, 443-44 (6th Cir. 2005) The alignment between the objectives and interests of the government and the proposed intervenor is demonstrated by the fact that Mt. Horeb asserts essentially the same arguments in its tendered motion for summary judgment that the LFUCG has asserted to support its denial of the application.

Accordingly, Mt. Horeb does not have a right to intervene in this case. The Court may still permit it to intervene if it is given a conditional right to intervene by a federal

7

statute; or "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). Mt. Horeb does not argue that a federal statute grants it a conditional right to intervene. Assuming there is a common question of law or fact, the Court must consider whether intervention would result in undue delay or prejudice to the original parties. Fed. R. Civ. P. 24(b)(3).

Delay is of special importance in this action because the plaintiffs seek review under 47 U.S.C. § 332(c)(7)(B)(v) which provides for *expedited* judicial review to a person adversely affected by a local government's action. The parties developed a scheduling order that provided for briefing to be completed by January 26, 2016. The neighborhood association did not move to intervene until the date that the parties had completed their briefing. Further, the statute grants the right of judicial review only to the person "adversely affected" by the government's actions. Permitting Mt. Horeb to intervene in this action would delay a judgment and prejudice the plaintiffs, the only parties granted a right to pursue this action.

Moreover, the delay would be undue because, as discussed, Mt. Horeb has the same ultimate objective as the LFUCG and asserts essentially the same arguments. Thus, its interests are adequately represented. Further, because this action calls for a review of a local government decision, the Court sees no purpose in expanding this matter beyond the governmental entity that issued the decision and the applicant adversely effected by it.

Accordingly, the Court declines to permit Mt. Horeb to intervene in this action.

### III. Motions for summary judgment

In accordance with the parties' proposed schedule, the Court set a hearing on the parties' motions for summary judgment for February 17, 2016. However, the parties jointly moved to cancel the hearing, agreeing that the matters had been fully briefed, that the full administrative record was filed, and that an oral argument was unnecessary. (DE 35, Joint

Motion.) Accordingly, the Court canceled the hearing.

### A. Timeliness of the reasons for denial

A local government's decision to deny a request to place or construct a wireless facility like the monopole must be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The Supreme Court has held that localities "must provide reasons when they deny applications to build cell phone towers." *T-Mobile South, LLC v. City of Roswell,* Georgia, 135 S.Ct. 808, 814 (2015). This is because "courts must be able to identify the reason or reasons why the locality denied the application" in determining whether the denial was supported by substantial evidence. *Id.* Further, an entity adversely affected by the denial must seek judicial review of it within 30 days of the decision by the local government. 47 U.S.C. § 332(c)(7)(B)(v). An applicant may not be able to make a "considered decision whether to seek judicial review without knowing the reasons for the denial." Id. at 816. Thus, in *Roswell* the Supreme Court held, the locality cannot delay the release of its reasons "for a substantial time after it conveys its *written* denial." *Id*. at 816 (emphasid added). Instead, "the locality must provide or make available its written reasons at essentially the same time as it communicates its denial." *Id*. at 817.

The plaintiffs argue that the LFUCG's denial was faulty here because the government did not provide written reasons for the denial at "essentially the same time" as the oral denial, which occurred at the September 10, 2015 public meeting. The LFUCG's written denial and reasons came in a letter dated September 30, 2015.

*Roswell*, however, requires that the written reasons be issued at essentially the same time as the *written* denial, not the *oral* denial. This is because it is the written denial that triggers the 30-day clock for judicial review. The act provides that the 30-day clock begins with the "final action or failure to act by a State or local government." 47 U.S.C.

9

§ 332(c)(7)(B)(v). "The relevant 'final action' is the issuance of the *written* notice of denial." *Roswell*, 135 S.Ct. at 817, n.4 (emphasis added).

Here, the written denial consisted of the September 30, 2015 letter. The plaintiffs' 30-day clock began then. There is no dispute that the letter contained the reasons for the denial. Accordingly, the written denial complied with the Telecommunications Act and *Roswell*.

### B. The effective prohibition of wireless service

The Telecommunications Act prohibits a local government from regulating the placement or construction of wireless facilities in a way that has "the effect of prohibiting the provision of personal wireless services." 47 U.S.C.A. § 332(c)(7)(B)(i)(II). The Sixth Circuit has held that this provision is violated where two conditions exist.

First, the provider must show that the government's denial of its application to construct or place a telecommunications facility prevents it from filling a significant gap in its own service coverage. *T-Mobile Central, LLC v. Charter Twp. of West Bloomfield*, 691 F.3d 794, 806 (6th Cir. 2012) (quoting *MetroPCS, Inc. v. City and Cnty. of San Francisco*, 400 F.3d 715, 733 (9th Cir. 2005), *abrogated on other grounds by T-Mobile S., LLC v. City of Roswell,* 135 S.Ct. 808 (2015)). With its application and at the hearing, Verizon presented evidence that its RF engineers had identified a "significant gap" in Verizon's wireless coverage in an area in north Lexington that lies between Russell Cave Road and Newtown Pike. This evidence consisted of reports by RF engineers, including propagation maps, dropped call data and a detailed explanation of the reports. This is the kind of evidence that supports a claim for a significant gap in coverage. *West Bloomfield*, 691 F.3d at 807.

There was no competent contradictory evidence presented. At the hearing, some lay objectors questioned the need for the proposed facility but they offered no evidence to

support their speculation. In its brief, the LFUCG does not dispute the existence of a significant gap in Verizon's coverage in the area at issue.

Verizon further presented evidence that its engineers had identified the area where the antenna site "must be located" in order to remedy the coverage gap. (DE 16-3 CM-ECF p. 6.) This "search area" included the location of the proposed monopole. (DE 16-3 CM-ECF p. 7.) The LFUCG does not dispute this or cite any contradictory evidence. Thus, Verizon has established that the LFUCG's denial of its application prevents it from filling a significant gap in its wireless coverage.

Second, the provider must show it has made a "good faith effort. . . to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc." *West Bloomfield*, 691 F.3d at 808. (citation omitted).

Verizon presented a site analysis report detailing the steps it took to identify an adequate antenna site in the search area. After its engineers identified the coverage gap, they identified "the geographic area where the antenna site must be located in order to close the gap and issued a map (called a Search Area) that identified the general area in which a new site must be located." (DE 16-3, Site Analysis Report at CM-ECF p. 6.)

Verizon first evaluated whether it could co-locate its antenna on an existing structure but determined that there were no suitable tall structures in the search area that would permit Verizon to resolve the coverage gap. (DE 16-3 at CM-ECF p. 7.) After ruling out any existing structures, Verizon reviewed the search area to determine where it could locate an antenna site in compliance with Article 25's zoning requirements. (DE 16-3 at CM-ECF p. 7.)

In accordance with Article 25, it first looked for public property sites but determined that none existed in the search area. (DE 16-3 at CM-ECF p. 8.) Verizon next removed any

parcels that were 40 acres or less. This is because all parcels in the search area are zoned A-R (Agricultural Rural) and a zoning ordinance requires that any parcel zoned A-R must have a minimum lot size of 40 acres. Further, another zoning ordinance requires that a lease for construction of a telecommunications tower shall not reduce the tract to less than the 40 acres required for parcels zoned A-R. (DE 16-3 at CM-ECF p. 8.)

Verizon next removed from consideration any land in the search area that is part of the LFUCG's Purchase Development Rights Program. Verizon explained that these properties are subject to conservation easements which restrict development on them and limit the land to agricultural uses only.  (DE 16-3 at CM-ECF p. 8.)

After ruling out any unsuitable parcels of land, Verizon visited the remaining parcels to 1) confirm the availability of sufficient land space for the proposed facility; 2) identify a specific location for the facility on the parcel; 3) identify any recognized environmental conditions that would disqualify the parcel from consideration; 4) identify any construction issues that would disqualify the parcel; and 4) to assess the potential impact of the facility on neighboring properties. (DE 16-3 at CM-ECF p. 8.)

After performing this analysis, Verizon approached three landowners. The plaintiff Michael Quagliano was the only owner who indicated a willingness to lease his land for the facility. (DE 16-3 at CM-ECF p. 8.) Verizon asserts that the "tower must be located at the proposed location and proposed height to provide necessary service to wireless communications users in the subject area." (DE 16-1 at CM-ECF p. 9.)  At the hearing, plaintiffs' counsel stipulated that, if the LFUCG required it, the plaintiffs would construct a "stealth silo" at the location instead of a tower. (DE 18-2, Tr. at CM-ECF p. 15.)

The LFUCG does not dispute any of the plaintiffs' evidence. There was no competent evidence that any alternative location exists that would be adequate to remedy the coverage gap. Further, there was no competent evidence that Verizon's procedure for identifying an

adequate location was somehow faulty. Finally, there was no competent evidence to refute Verizon's proof that the tower must be located at the site proposed in order to remedy the coverage gap.

At the hearing, some lay objectors questioned Verizon's evaluation of alternative sites, but the objectors presented no evidence in support of those speculations. There was no expert evidence offered in opposition to Verizon's need for the facility or the adequacy of its site selection process at all. In its brief before this Court, the LFUCG does not even address Verizon's argument that the government's denial of its application effectively prohibits it from providing wireless coverage in the affected area.[1]

Accordingly, Verizon has demonstrated that it put forth a good faith effort to find an alternative location for the proposed monopole but that no other location was suitable. Because Verizon has met its burden as to both prongs, the Court finds that the LFUCG's decision had "the effect of prohibiting the provision of personal wireless services" in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).  Having reached this conclusion, the Court declines to address whether the decision is supported by substantial evidence or whether it violated state law. *See T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 999 (9th Cir. 2009) (finding that the city's denial of the application was supported by substantial evidence but that it constituted an effective prohibition of services and, therefore, the provider was entitled to summary judgment).

## IV.    Conclusion

For the foregoing reasons, the Court hereby ORDERS as follows:

1) the Historic Mt. Horeb Neighborhood Association's motion to intervene (DE 25) is DENIED and its motion for summary judgment is DENIED as moot (DE 32);

2) the LFUCG's motion for summary judgment (DE 21) is DENIED;

---

[1] Nor does Mt. Horeb address this argument in its tendered response.

3) the plaintiffs' motion for summary judgment (DE 19) is GRANTED; and

4) the LFUCG's denial of Verizon's application is REVERSED. The LFUCG is hereby ORDERED to provide any and all permits necessary for the construction of the proposed wireless facility.

Dated February 29, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY